

**DEC 1 4 2007**



WGB/LBH/mm/#1760152

07810-07001

**DEC 1 4 2007**

**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EILEEN M. HUSS, individually and as
Guardian for JOSEPH R. HUSS, JR.
1619 Leabrook Lane
Wheaton IL 60187,

                Plaintiff,

vs.

IBM MEDICAL AND DENTAL
PLAN and R.A. BARNES, in her capacity as
PLAN ADMINISTRATOR,
3808 Six Forks Road,
Raleigh, N.C. 27609,

                Defendants.

**07CV7028
JUDGE ZAGEL
MAG. JUDGE COLE**

---

## COMPLAINT

The Plaintiff, Eileen M. Huss, individually and as guardian for Joseph R. Huss, Jr., asserts the following claims for relief:

**Parties**

1.    Plaintiff Eileen M. Huss ("Eileen") is a citizen of the State of Illinois, residing at 1619 Leabrook Lane, Wheaton, Illinois, 60187, and at all times material has been the legal guardian for her disabled son, Joseph R. Huss, Jr. ("Joseph").

2.    Defendant IBM Medical and Dental Plan ("the IBM Plan") is the legal entity through which the IBM Corporation ("IBM") provides employee benefits to its active and retired employees. The benefits program offered by IBM is governed by the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), including the health insurance benefits that are the subject of this action. The IBM Plan address is 3808 Six Forks Road, Raleigh, North Carolina, 27609. The IBM Plan regularly does business within

the State of Illinois in the course of providing and administering employee benefits for current and former employees of IBM.

3.    Defendant R.A. Barnes ("Barnes") is the plan administrator for the IBM Plan, operating out of the Office of the Plan Administrator, IBM Employee Services Center, 3808 Six Forks Road, Raleigh, N.C., 27609. Barnes administers employee benefits provided under the IBM Plan to current and former employees of IBM residing within the State of Illinois. Barnes has at all times material to this complaint acted as the duly authorized representative of the Plan, acting within the course and scope of her responsibilities as the plan administrator.

**Jurisdiction and Venue**

4.    Jurisdiction is based upon 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1), as this action asserts a claim for benefits and for equitable relief pursuant to 29 U.S.C. §§ 1024(b)(4), 1132(a)(1)(B), 1132(a)(3)(A) and (B), 1132(c), 1133, 1132(g)(1), and 29 C.F.R. § 2560.503-1(g).

5.    Venue is proper in the Northern District of Illinois based upon 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2), as the breach of the IBM Plan obligations giving rise to this action took place within the Northern District of Illinois; defendants' conduct was directed at the plaintiff while plaintiff was residing and physically located within the Northern District of Illinois; and both IBM and the IBM Plan regularly conduct business within the Northern District of Illinois.

**Background Allegations**

6.    On December 31, 2006, Eileen retired as an IBM employee after more than 30 years of service. During her employment and upon her retirement, Eileen was at all times material both a participant and a beneficiary under multiple iterations of the IBM Plan.

7.    Eileen's son Joseph was born on August 8, 1981, while Eileen was an active, full-time employee of IBM. Since his birth, Joseph has suffered from a severe mental disability that renders him incapable of speech, and has at all times been completely

2

dependent upon his parents for his support and well-being. Eileen has been a participant in the IBM Plan throughout Joseph's entire, 26-year lifetime. Joseph has been a dependent of Eileen and has been continuously eligible to enroll in the IBM Plan since his birth.

8.     Although he has been continuously eligible to enroll in the IBM Plan during the Plan's open enrollment period each year, Joseph has not always been enrolled in the IBM Plan. Upon information and belief, Joseph was enrolled in the IBM Plan from the date of his birth through December 31, 1997. Since Joseph's initial enrollment in the IBM Plan and thereafter, the IBM Plan knew or should have known of Joseph's severe mental disability. Commencing on January 1, 1998, Joseph was enrolled in an employee benefit plan offered through his father's employer.

**The IBM Plan Enrolls Joseph in the Plan**
**Effective January 1, 2007**

9.     In late 2005 or early 2006, Eileen contacted a Customer Service Specialist in the Employee Services Center of the IBM Plan to enroll Joseph in the IBM Plan. Under the IBM Plan, disabled adult dependents of IBM employees and retirees can continue to receive benefits under the IBM Plan so long as they meet the special eligibility requirements applicable to disabled dependents age 23 and older. Joseph met those requirements at the time of this call, and continues to meet each of those eligibility requirements. Eileen was told to call again six months prior to her retirement to ensure that Joseph was enrolled in the IBM Plan.

10.     Pursuant to the instructions she had received, on June 15, 2006, Eileen again contacted a Customer Service Specialist in the Employee Services Center of the IBM Plan to enroll Joseph in the IBM Plan. After Eileen provided him with the necessary information concerning Joseph, the Customer Service Specialist placed Eileen on hold while he confirmed whether any additional steps were required to enroll Joseph as a participant in the IBM Plan. The Customer Service Specialist then told Eileen that no additional steps were

required, and that he had enrolled Joseph in the IBM Plan with an effective date of January 1, 2007, the beginning of the next plan year.

**IBM Reverses its Decision—**
**Joseph is Expelled from the Plan Based on a**
**Failure to Submit a Written Application Back in June of 2004**

11.     On January 3, 2007, a few days after her retirement as an IBM employee, Eileen called the Customer Service Specialist to address a number of benefits issues related to her retirement.  During this conversation, Eileen was told for the first time that Joseph's enrollment in the IBM Plan was in jeopardy.  Contrary to the specific confirmation of Joseph's enrollment provided on June 15, 2006, Eileen was told in a follow-up call on January 5, 2007 that Joseph was no longer enrolled in the IBM Plan.  Eileen was told that "she would have had to submit an application to continue her son as an eligible disabled dependent within 60 days prior to him turning age 23 in order to keep him as a dependent." Eileen was told that because "this application had not been received" back in June of 2004, Joseph was *permanently barred* from receiving the benefits he would otherwise have been entitled to receive under the IBM Plan.

**Eileen Requests Applicable Plan Language and**
**Other Documents Germane to IBM's Reversal**

12.     On January 8, 2007, Eileen spoke to Todd Rogers, an IBM Retirement Benefits Coordinator, and requested copies of the policy language and plan documents necessary to evaluate the decision to expel Joseph from the Plan.  Eileen followed up on this request in an email that same day, and also requested that she be provided with copies of all notices or instructions that IBM had ever sent to plan participants concerning the purported requirement to submit a written application prior to a disabled dependent's attaining age 23.  On January 9, 2007, Rogers told Eileen that he would check to see if there was any additional information necessary to her appeal of Joseph's expulsion from the IBM Plan.

**IBM Denies any Other Documents Exist**

13.     On January 16, 2007, Rogers called Eileen and told her that *there was no such additional information.* The next day, in a January 17, 2007 email, Rogers confirmed that he had "done some research with our back office to see if there is any additional documentation that you might have received or need to research your appeal," and that he had confirmed that the only responsive document was a single Summary Plan Description he had ordered. The IBM Plan then mailed a copy of a Summary Plan Description with a "publication date" of December 22, 2006, and with a purported "effective date" of January 1, 2006 ("the 1/1/2006 SPD").

**Eileen Renews Request for Documents—**
**IBM Again Denies any Such Documents are Available**

14.     On January 23, 2007, Eileen sent another email to Rogers acknowledging receipt of the 1/1/2006 SPD, and requesting a copy of the actual health insurance policy or contract "to ensure that I am not missing anything." Since the IBM Plan was expelling Joseph from the Plan based on Eileen's failure to submit a written application back in 2004, Eileen requested the 2004 version of the summary plan description. In its January 29, 2007 responsive email, the IBM Plan told Eileen that *no such documents were available*, and that the only document she needed was the 1/1/2006 SPD. Rogers closed his January 29th email by claiming that he could not send any additional information to Eileen to a "non-IBM email address," instructing Eileen to communicate by telephone if she needed more information.

**Eileen Submits March 27, 2007 Initial Appeal**

15.     On March 27, 2007, Eileen sent an appeal letter (through counsel) to the IBM Plan "requesting that the Plan Administrator reverse an erroneous eligibility determination, and enroll her son, Joseph, in the IBM Plan." Eileen pointed out in the letter that the 60-day application requirement relied upon by the IBM Plan applied only to dependents who were already enrolled in the IBM Plan, and wanted to be certain to continue receiving health insurance benefits upon reaching age 23. In bold, italicized letters, Eileen

5

renewed her request for copies of all "Summary Plan Descriptions for 2004, 2005, and 2007."

**IBM Plan Rejects Initial Appeal—**
**Misstates Plan Language and Ignores Basis for Appeal**

16.     On April 26, 2007, the IBM Plan sent an unsigned letter to Eileen's counsel rejecting her March 27, 2007 appeal. Quoting from an unidentified version of the SPD, the anonymous letter announced in a conclusory fashion that because Eileen had not submitted a written application at least 60 days prior to Joseph's turning age 23, Joseph was forever barred from enrolling in the IBM Plan. The letter misstated the plan language it was relying upon, and failed to address the key contention that the SPD only imposed a 60-day application requirement on currently enrolled dependents who were already receiving health benefits under the plan, and wanted to continue receiving benefits beyond age 23 without a gap in coverage. The April 26, 2007 letter ignored the argument that there was no language in the SPD requiring the submission of an application merely to continue a dependent's general, annual eligibility to enroll in the Plan.

17.     Although the IBM Plan had denied on three occasions that there were any operative documents other than the 1/1/06 SPD, the April 26, 2007 letter included copies of *three additional* SPDs dated August 5, 2003, September 9, 2004, and December 20, 2005, that had not been produced previously. The anonymous letter described these documents as "IBM's Summary Plan Description[s] for the 2003, 2004 and 2005 plan years." IBM belatedly produced these documents only after her counsel had intervened on her behalf. As it later turned out, this belated, April 26, 2007 production still was incomplete.

**Eileen Submits June 12, 2007 Final Appeal**

18.     On June 12, 2007, Eileen appealed the April 26, 2007 IBM Plan decision (copy of 6/12/2007 appeal letter attached as Exhibit 1, without enclosures). Because the IBM Plan's April 26, 2007 letter had not even grappled with the actual, plan language at issue, the June 12, 2007 appeal letter reiterated the points raised in Eileen's initial, March 27,

2007 appeal. The appeal letter also pointed out, with the benefit of the belatedly produced SPD documents, that the SPD had been amended to make clear that the 60-day application requirement had no applicability to Eileen and Joseph's circumstances.

19.     Upon review of the SPDs that had been produced for the first time with the April 26, 2007 letter, it also was discovered that the IBM Plan *still had not provided Eileen with all of the plan documents she had requested*. The June 12, 2007 appeal letter again demanded that the IBM Plan immediately produce all responsive documents. The June 12, 2007 appeal letter also requested additional information germane to the appeal, setting forth these requests in Tab 4 to the June 12, 2007 letter (copy of Tab 4 enclosed as Exhibit 2 to this complaint).

**IBM Rejects Eileen's Final Appeal—**
**Relies on the Wrong Plan Document and**
**A Nonexistent Application Requirement**

20.     On August 8, 2007, Barnes issued a letter rejecting Eileen's appeal, and confirming that Eileen had exhausted all pre-suit appeals. Although the IBM Plan had requested an extension of time in order to obtain advice of its own counsel, the August 8, 2007 letter once again failed to address the specific SPD language relied upon by Eileen in her appeal. Worse, the August 8, 2007 denial letter quoted and relied upon a policy provision that did not even exist at the time Joseph had turned age 23. All along, the IBM Plan had contended that Joseph was barred from the Plan because Eileen had not submitted a written application to enroll Joseph in the Plan back in June of 2004. Barnes claimed in her letter that Eileen had neglected to submit the *"Over Age 23 Disabled Child Application"* in June of 2004. However, a review of the belatedly produced SPD for 2004 confirms that no such application even existed in 2004. Thus, Barnes and the IBM Plan had been quoting from *the wrong plan document* and had been relying upon a *nonexistent written application requirement* to justify the decision to exclude Joseph from the IBM Plan. Barnes failed to consider the correct plan document even though Eileen's two, prior appeal letters had emphasized the importance of reviewing the version of the plan in effect in June of 2004.

**IBM Fails to Furnish and Disclose Requested Information**

21.    Barnes' letter stated that she was addressing each of the requests for information contained in Tab 4 of the June 12, 2007 appeal letter. In fact, and contrary to her obligations as an ERISA fiduciary, Barnes ignored certain requests for information, provided non-responsive and incomplete information to some requests, and entirely withheld information responsive to other requests:

a.   Although IBM has expelled Joseph from the IBM Plan based on a purported requirement to apply to IBM for Joseph's enrollment, Barnes refused to provide the actual printouts documenting Eileen's contacts with IBM, including case notes, electronic or paper chronologies, and internal emails, instead producing only purported summaries of these contacts and events, as well as redacted versions of emails.

b.   Although IBM's expulsion of Joseph from the Plan is based on Eileen's conduct and purported omissions *in June of 2004*, Barnes refused to provide even *summaries* of Eileen's contacts with IBM *prior to January of 2006*, including case notes, electronic or paper chronologies, internal emails, and other documents directly germane to IBM's decision.

c.   Although IBM admits that its trained employee benefits personnel confirmed Joseph's right to enrollment in the Plan on June 15, 2006, Barnes refused to provide any information and documentation of the internal discussions and actions leading to Joseph's enrollment, as well as the discussions and actions leading to IBM's subsequent reversal of its initial decision to enroll Joseph in the Plan.

d.   Although the individuals involved in Joseph's expulsion from the Plan owe a fiduciary duty to Eileen and Joseph, Barnes refused to disclose even the identities and titles of these individuals.

e.   Although IBM admits that its trained benefits personnel initially interpreted the plan language as requiring Joseph's enrollment effective January 1, 2007, and although Barnes was provided with seventh circuit authority making clear that the parties' construction of plan language could be compelling evidence in favor of coverage in such cases, Barnes failed to produce or even comment upon the requested documents reflecting the IBM Plan's past interpretations of these enrollment requirements when addressing the requests of other, similarly situated disabled dependents age 23 and older.

f.   Barnes provided inaccurate information concerning the history of Joseph's enrollment in the IBM Plan, identifying an initial enrollment date of February 8, 1980—before Joseph was even born.

8

22. Barnes' August 8, 2007 letter confirmed that the IBM Plan had once again withheld additional responsive documents in its prior responses. Despite the repeated requests for such documents by Eileen and her counsel, the IBM Plan belatedly produced even more summary plan descriptions for the first time in its August 8, 2007 letter.

## First Claim for Relief—
## Claim for Enrollment and Benefits

23. All prior paragraphs are incorporated by reference.

24. Eileen has at all times material been a qualified participant and beneficiary under the multiple iterations of the IBM Plan, and at all times material, her dependent son, Joseph, has been eligible to enroll in the IBM Plan as a dependent participant and beneficiary.

25. Pursuant to the applicable IBM Plan documents, Eileen satisfied all conditions precedent to maintain her own eligibility under the IBM Plan, and to maintain the eligibility of her dependent son, Joseph.

26. On June 16, 2006, the IBM Plan informed Eileen that consistent with Eileen's rights under the IBM Plan, Joseph had been enrolled as a disabled dependent in the IBM Plan effective January 1, 2007. The IBM Plan Customer Service Specialist enrolled Joseph in the Plan only after consulting internally to ensure that this decision was correct. This specialist advised Eileen that Joseph had met the eligibility requirements for the IBM Plan and therefore had been enrolled in the Plan effective January 1, 2007, and that nothing further was required of Eileen to permit Eileen and Joseph to enjoy the benefits of the IBM Plan.

27. On January 5, 2007, the IBM Plan erroneously reversed its decision, and told Eileen that Joseph had been removed from the IBM Plan. Eileen was told that at least 60 days prior to Joseph's 23rd birthday of August 8, 2004, she had been required to submit an application to enroll Joseph in the Plan. Thus, according to IBM, Eileen had been required to submit this application no later than June 9, 2004.

9

28. The IBM Plan's decision is clearly erroneous, and the January 5, 2007 removal of Joseph from the IBM Plan violates the contractual and statutory rights of Eileen and Joseph.

29. First, the 60-day application requirement relied upon by IBM does not even apply to dependents who are not already enrolled in the Plan. The application requirement is for the continuation of benefit payments to current participants, not the preservation of annual enrollment eligibility. The 60-day application requirement gives the IBM Plan time to evaluate whether a dependent *currently relying upon the Plan for benefits* meets the new eligibility requirements applicable upon that dependent's attaining age 23. Conversely, there is nothing in the plan documents requiring the submission of an application to preserve a dependent's eligibility to apply for enrollment each year during the Plan's annual, open enrollment period. To the contrary, the Plan explicitly provides in multiple sections of the plan documents: "*Each year*, during an enrollment period usually held in the fall, *you will have the opportunity to elect coverage for* yourself and any other *eligible family members you wish to enroll for the upcoming plan year* (normally January 1 through December 31)."

30. Second, the 60-day application requirement relied upon by IBM to expel Joseph from the IBM Plan *did not even exist at the time Eileen supposedly was required to submit this application*. The version of the plan that was in effect on June 9, 2004, 60 days prior to Joseph's 23rd birthday, contains no requirement whatsoever for the submission of an application (§ 3.1.1.4 of the August 5, 2003 version of the SPD). Thus, Barnes did not even read the correct version of the plan documents when reaching her erroneous decision. In fact, not only is there no such requirement in the version of the plan documents in effect on June 9, 2004, but there is no such requirement in any of the next three versions of the plan documents published by IBM (§ 3.1.1.4 of the 6/17/2004, 7/22/2004, and 8/12/2004 versions of the SPD). It appears from the summary plan descriptions belatedly produced by IBM that an application requirement was first introduced in the SPD published on June 30, 2005—long after Joseph had already turned 23.

10

31.    ERISA imposes an obligation to draft plan language calculated to be understood by the average plan participant, sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan. *See* 29 U.S.C. § 1022(a). Further, the summary plan description must clearly set forth the plan's requirements for eligibility, as well as the circumstances that may result in disqualification, ineligibility or denial or loss of benefits. 29 U.S.C. § 1022(b). Contrary to these obligations, IBM seeks to advance an "interpretation" of the plan that would impose a one-shot deadline to preserve a disabled dependent's eligibility, without any disclosure in the plan documents of such a requirement and attendant consequences.

32.    According to IBM's interpretation, a failure to submit an application 60 days prior to the dependent's turning age 23 triggers the dependent's permanent, lifetime exclusion from the Plan. Section 3.1.1.4 of the SPD does not "reasonably apprise" participants of a potential, permanent loss of coverage in "language calculated to be understood by the average plan participant." Indeed, the IBM Plan's own professional employee benefits specialists did not understand the plan language to impose such a requirement. IBM's interpretation of § 3.1.1.4 erroneously equates continuation of the receipt of *benefits* to someone already enrolled in the plan with preservation of *annual eligibility to enroll* in a plan. These are two separate and distinct concepts, and the 60 day application requirement applies only to the former, not to the latter.

33.    Alternatively, the IBM Plan has waived the right to enforce this purported, 60-day application requirement. Even if IBM could reasonably argue that § 3.1.1.4 creates a one-shot opportunity to preserve Joseph's eligibility, the IBM Plan's enrollment of Joseph into the Plan on June 16, 2006 waived any rights it would otherwise have had to enforce this provision. While coverage cannot be created by waiver or estoppel, a plan administrator can waive administrative requirements or conditions, such as the submission of an application by a particular date.

11

34.     Further, the IBM Plan is equitably estopped from attempting to enforce this purported administrative requirement.  Since January 5, 2007, the IBM Plan has pointed to Eileen's purported failure to submit a written application in June of 2004 as its basis for excluding Joseph from the Plan.  It turns out, however, that Barnes and her colleagues have not even been reading the right version of the contract.  The 2004 version of § 3.1.1.4 only requires a phone call, not the submission of an application.  Because it was not reading the right contract, the IBM Plan presumably has not even investigated what phone calls were made by Eileen prior to June 9, 2004, and certainly has not asserted the lack of such a call as the basis for Joseph's exclusion from the Plan.  Further, the IBM Plan has refused to produce *any* documentation of *any* contacts between Eileen and the IBM Plan prior to January of 2006, let alone telephone contacts occurring in 2004 or earlier.

35.     Having repeatedly relied on the wrong version of the SPD; having repeatedly pointed to a "written application" requirement that did not even exist in 2004; and having refused to produce any documentation of contacts between Eileen and the IBM Plan prior to January of 2006, the IBM Plan is estopped from premising its expulsion of Joseph from the Plan based on what telephone calls were or were not made on or before June 9, 2004. The IBM Plan had a fiduciary obligation to review and rely on the correct plan document, to articulate a specific explanation for its claim decision, to accurately describe the terms and conditions of the Plan, and to timely produce requested documents and information germane to Eileen and Joseph's enrollment and benefits claim.  Barnes and the IBM Plan have failed to discharge even one of these basic obligations, and are equitably estopped from asserting new theories at this juncture.

36.     Joseph and Eileen have been harmed by Joseph's exclusion from the IBM Plan.  Eileen has been forced to obtain health benefits for Joseph outside of the IBM Plan, depriving her of the benefits of the reimbursement for health care costs otherwise payable to her under the IBM Plan.  Pursuant to 29 U.S.C. §§ 1132(a)(1)(B) and 1132(a)(3)(A), Eileen and Joseph are entitled to an order requiring the reinstatement of Joseph in the IBM Plan,

12

and a permanent injunction prohibiting the IBM Plan from expelling Joseph from the IBM Plan in the future.

37.    Pursuant to 29 U.S.C. § 1132(a)(3)(A), Eileen further requests that this Court order the IBM Plan (a) to amend the plan documents to provide all plan participants and beneficiaries a plain-English explanation of the eligibility requirements in language meeting the requirements of 29 U.S.C. § 1022; and (b) to enroll similarly situated dependents who have been barred from the IBM Plan retroactive to the dates of such requests.  Until and unless the plan is amended, moreover, the IBM Plan should be permanently enjoined from barring similarly situated dependents from the IBM Plan.

**Second Claim for Relief—**
**Statutory Penalties for Failure to Disclose**

38.    All prior paragraphs are incorporated by reference.

39.    Pursuant to 29 U.S.C. §§ 1132(c), 1024(b)(4), and 29 C.F.R. § 2560.503-1(g), Eileen and Joseph are entitled to separate awards of statutory penalties against Barnes as the Plan Administrator, in an amount equal to $100.00 per day, to be calculated separately for each document that has been withheld by the IBM Plan, as "each violation with respect to any single participant or beneficiary shall be treated as a separate violation."  Eileen and Joseph's information requests were clear, direct, and relevant to the assessment of the parties' respective rights and obligations under the IBM Plan.  If the IBM Plan had been acting in accord with its fiduciary obligations, it would have been gathering and reviewing all of this information on its own, even before Eileen asked for it.  Not only did the IBM Plan fail to produce the requested documents and information in a timely fashion, but the plan fiduciaries repeatedly misrepresented to Eileen that no such documents existed or were available.  Because these refusals to disclose documents and information are egregious, repeated, and continuing, the maximum, $100.00 daily penalty for each day that each document was withheld is appropriate.

40.    Such documents and information include, without limitation:  (a) each of the Summary Plan Descriptions that the IBM Plan failed to produce within 30 days of Eileen's initial, January 8, 2007 request; (b) each document reflecting contacts between Eileen and the IBM Plan, as requested in Eileen's June 12, 2007 letter; (c) each document reflecting the involvement of the IBM Plan personnel who initially confirmed Joseph's entitlement to enrollment effective January 1, 2007, as well as the personnel who decided to reverse this decision and expel Joseph from the IBM Plan, as requested in Eileen's June 12, 2007 letter; (d) each document withheld by the IBM Plan reflecting the circumstances surrounding the acceptance of other disabled dependents for enrollment in the IBM Plan on or after attaining the age of 23, as requested in Eileen's June 12, 2007 letter; and (e) any additional documents falling within Eileen and Joseph's requests that are later determined through discovery in this action to have been withheld by the IBM Plan.

**Third Claim for Relief—**
**Breach of Fiduciary Duty against Barnes**

41.    All prior paragraphs are incorporated by reference.

42.    Pursuant to 29 U.S.C. §§ 1104, 1109, 1132(a)(3), and 1133, Eileen and Joseph are entitled to equitable relief to address and redress multiple, egregious violations of Barnes' fiduciary duties.  As a plan fiduciary, Barnes was obligated:

a.  to provide participants with a summary plan description written in a manner calculated to be understood by the average plan participant, and sufficiently accurate and comprehensive to reasonably apprise participants of the requirements to maintain eligibility and to avoid the loss of benefits;

b.  to act at all times with care, skill, prudence, and diligence in responding to questions about and claims for enrollment, coverage and benefits, and provide a fair and honest evaluation of Eileen and Joseph's rights and entitlements under the IBM Plan, premised upon a review of the correct plan documents;

14

c. to provide a straightforward and meaningful explanation of a benefits and eligibility decision, acknowledging and squarely addressing the plan language relied upon and the specific arguments asserted in support of a claim for benefits and enrollment; and

d. to furnish timely and complete disclosure of requested summary plan descriptions, documents, and other information related to an eligibility and benefits claim and the plan's response to same.

43.    Barnes and the IBM Plan breached these fiduciary duties as follows:

a. Barnes and the IBM Plan have advanced an "interpretation" of § 3.1.1.4 that is contrary to the actual words in the controlling clause, and that is at odds with the conclusion reached by its own professional benefits personnel.

b. Barnes and the IBM Plan have relied upon the wrong version of the plan; have excluded Joseph from the plan based on purported noncompliance with a condition precedent that did not even exist at the time in question; put forward a distorted interpretation of the inapplicable plan document; failed to acknowledge or address the specific plan language quoted by Eileen and Joseph in support of Joseph's enrollment rights; and repeatedly refused to gather, review, and produce documents and information necessary to a fair and principled review and resolution of Joseph's rights.

c. There are no secrets between a fiduciary and the beneficiary of a fiduciary's duty of loyalty, nor is there any basis for forcing plan participants to file a lawsuit to obtain benefits, documents, and information that should be freely and timely provided in the first place. Given the importance and permanence of the enrollment decision confronting them, Barnes and the IBM Plan owed Eileen and Joseph a careful, deliberative, and honest review and assessment of Joseph's enrollment request. Where, as here, Barnes did not even read the correct plan document, those basic fiduciary obligations have not been discharged.

44.    Pursuant to 29 U.S.C. §§ 1104, 1109, 1132(a)(3), and 1133, Eileen and Joseph are entitled to an order granting equitable relief redressing the defendants' violations of their fiduciary obligations, including an order reinstating Joseph in the Plan retroactive to January 1, 2007, permanently enjoining IBM from expelling Joseph from the IBM Plan, and ordering such other and further relief as this Court deems equitable.

**Fourth Claim for Relief—**
**Attorneys' Fee Award**

45.     All prior paragraphs are incorporated by reference.

46.     There is no reasonable or substantial justification for the "interpretation" put forward by Barnes and the IBM Plan to exclude Joseph from the IBM Plan.  Pursuant to 29 U.S.C. § 1132(g)(1), Eileen and Joseph are entitled to recover an award of reasonable attorneys' fees and costs in this action from January 8, 2007 to the date of the entry of judgment.

47.     If the defendants had fairly and honestly considered the plan language and points advanced by Eileen, and had gathered, reviewed, and produced the documents and information requested by Eileen, there would have been no need for Eileen to file a lawsuit. Judgment should be entered in favor of Eileen and against Barnes and the IBM Plan, awarding reasonable attorneys' fees and costs in an amount to be determined by this Court.

WHEREFORE, Eileen and Joseph request that the Court enter an order granting the following relief:

A.     Reinstatement of Joseph in the IBM Plan, and permanently enjoining Joseph's exclusion from the IBM Plan in the future;

B.     Statutory penalties in favor of Eileen in an amount equal to the maximum penalty of $100.00 per day, per document and item of data withheld;

C.     Statutory penalties in favor of Joseph, identical to the award entered in favor of Eileen, in an amount equal to the maximum penalty of $100.00 per day, per document and item of data withheld;

D.     An injunction preventing the defendants from engaging in similar conduct in the future, requiring the IBM Plan to enroll similarly excluded disabled dependents in the IBM Plan, and requiring the defendants to amend the summary plan description to fairly apprise participants and beneficiaries of what is required to ensure their continued eligibility and to avoid jeopardizing their benefits; and

E.    An award granting such other and further relief that the Court deems just and equitable.

Respectfully submitted,

William G. Beatty Bar Number: 03121542
Attorney for Plaintiff, Eileen M. Huss
Of counsel
Johnson & Bell, Ltd.
33 West Monroe Street, Suite 2700
Chicago, IL 60603
Telephone: (312) 372-0770
Fax: (312) 372-2881
E-mail: beattyw@jbltd.com

and

Paul F. Heaton
GASS WEBER MULLINS LLC
309 North Water Street, 7th Floor
Milwaukee, Wisconsin 53202
Tel:    414-223-3300
Fax:    414-224-6116
heaton@gasswebermullins.com
srippich@gasswebermullins.com

Attorneys for Plaintiff, Eileen M. Huss

EXHIBIT 1



GASS WEBER MULLINS LLC

309 N WATER ST  MILWAUKEE WI 53202
TEL 414 223 3300  FAX 414 224 6116
WWW.GASSWEBERMULLINS.COM

PAUL F. HEATON
DIRECT DIAL  414 224-7655
heaton@gasswebermullins.com

June 12, 2007

IBM Plan Administrator
Employee Benefits
c/o IBM Employee Services Center
5411 Page Road
Durham, NC 27703

> Re:     Appeal of Eligibility Decision
>             Employee:  Eileen M. Huss (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)
>             Dependent:  Joseph R. Huss, Jr.
>             **Work Item # W011517-29MAR07**

Dear Plan Administrator:

I am writing to appeal IBM's April 26, 2007 Decision declining to enroll Joseph R. Huss, Jr., in the IBM Medical and Dental Plan ("the IBM Plan"), issued by IBM in response to my correspondence of March 27, 2007. *See* Tabs 1 and 2 (3/27/07 and 4/26/07 Correspondence).

Eileen M. Huss is a 30-year veteran of IBM, who retired on December 31, 2006. Eileen's son, Joseph, is a mentally disabled 25-year old young man, born on August 8, 1981. Eileen has been a participant in the IBM Plan throughout her entire career, and throughout her son's entire, 25-year lifetime. Although Joseph has always been a dependent of Eileen eligible to enroll in the IBM Plan throughout his entire life, Joseph has not been enrolled in the IBM Plan since 1995.

In August of 2006, four months before her retirement, Eileen contacted the IBM Employee Services Center to ask about enrolling Joseph in the IBM Plan. Eileen was told that nothing further needed to be done to enroll Joseph, and that IBM's enrollment records would be updated accordingly.[1]

---

[1] Because the phone call seemed uneventful at the time, Eileen does not know the name of the employee at the IBM Employee Service Center who affirmed that Joseph would be enrolled. Eileen since has been told, however, that IBM's records reflect Eileen's contact with this individual. In light

IBM Plan Administrator
Employee Benefits
June 12, 2007
Page 2

Immediately prior to her retirement, however, Eileen was told by Todd Rogers in the IBM Benefits Administration unit that Joseph would not be enrolled in the program as Eileen had been promised back in August. Mr. Rogers told Eileen that because she had not submitted an application to enroll Joseph in the "23-years and older disabled dependent program" under the IBM Plan 60 days prior to Joseph's 23rd birthday (August 8, 2004), Joseph was permanently barred from enrolling in the IBM Plan. IBM reaffirmed Mr. Rogers' determination in the April 26, 2007 Decision that is the subject of this appeal.

### IBM's Plan Guarantees the Right to Make New Enrollment Decisions Each and Every Year

Because IBM's April 26th Decision is not supported by the plain language of the IBM Plan, this Decision must be reversed, and Joseph must be enrolled in the IBM Plan. There is simply no "60-day window" requirement to *continue eligibility* under the IBM Plan. Although such an application is required for someone *currently* receiving benefits to maintain the *continued receipt of health benefits*, this requirement has no application where, as here, Joseph was not receiving benefits at the time he attained age 23. Because Joseph was not receiving benefits, he had neither a reason nor the ability to apply for the "*continuation*" of health benefits, and thus, there is no contractual impediment to Joseph's enrollment now.

IBM's April 26, 2007 Decision ignores the salient, *controlling* provisions of the IBM Plan.[2] Section 2.1 of the IBM Plan, titled *Benefits Enrollment*, distinguishes between the three, separate concepts of (1) *eligibility* to participate in the Plan, (2) *enrollment* in the Plan, and (3) *receipt of benefits* under the Plan: "All *eligible* IBM employees, surviving spouses/

---

of IBM's April 26th Decision, among the items requested in this letter is a printout of IBM's electronic record or case notes reflecting IBM's initial affirmation of Joseph's eligibility, the identification of the date, time, and employee participating in the call, and a description of any steps taken by the employee to attempt to enroll Joseph in the program.

[2] IBM has provided Eileen with the 2003, 2004, 2005, and 2006 iterations of Document Number USHR 106, the Summary Plan Description titled, *About Your Benefits—Health Care*. IBM maintains that an application should have been submitted on or before June 9, 2004—60 days prior to Joseph's attaining age 23. Accordingly, unless otherwise noted, all citations in this appeal letter are to the *August 5, 2003 version* of the *About Your Benefits—Health Care* SPD, since the effective date of the next year's SPD is September 9, 2004. For purposes of convenience of citation, I have enclosed at Tab 5 a bates-stamped version of the Summary Plan Descriptions produced by IBM.

IBM Plan Administrator
Employee Benefits
June 12, 2007
Page 3

domestic partners, and dependents must be *enrolled* in order to *receive* IBM medical, dental, and vision *benefits*." (IBM000018) (emphasis supplied).

Contrary to the suggestion that Eileen missed a "one shot" opportunity of enrolling Joseph in the Plan, the IBM Plan unambiguously promised Eileen that she would be given a chance to enroll Joseph in the Plan each and every year: "*Each year*, during an enrollment period usually held in the fall, *you will have the opportunity to elect coverage for* yourself and *any other eligible family members you wish to enroll* for the *upcoming plan year* (normally January 1 through December 31)." (IBM000018) (emphasis supplied). Pursuant to this plain, contractual language, Eileen's August 2006 request to enroll Joseph in the Plan should have resulted in Joseph's enrollment for the following plan year, enabling Joseph to receive health insurance benefits effective January 1, 2007.

Nor is § 2.1 the only place in the SPD that IBM promises Eileen a yearly opportunity to enroll Joseph as a dependent in the IBM Plan. Just a few paragraphs down, IBM once again promises Eileen an annual opportunity to enroll Joseph in the IBM Plan. In § 2.3 of the SPD, aptly titled *How the Program Works*, IBM promised Eileen and its other employees: "*Each year*, during an enrollment period usually held in the fall, *you will have the opportunity* to elect medical, dental and vision coverage *for yourself and any eligible family members you wish to enroll* for the *upcoming plan year* (normally January 1 through December 31)." (IBM000019) (emphasis supplied).

Confronted with these repeated, contractual promises of an *annual* enrollment opportunity, IBM now contends that § 3.1.1.4 of the SPD somehow undercuts those promises and deprives Eileen of her annual enrollment rights. There is no such provision contained anywhere in § 3.1.1.4 or anywhere else in the entire SPD. Although § 3.1.1.4 requires a *currently enrolled* dependent to submit an application before his 23rd birthday in order to *continue to receive health benefits* through the IBM Plan, there is no corresponding requirement for continued *eligibility* under the IBM Plan, nor is there a corresponding requirement for someone who has not been receiving health benefits to submit such a 60-day window application in order to initially *enroll* in the IBM Plan.

Ignoring the repeated, unambiguous guarantees of annual enrollment rights, IBM erroneously relies upon a sentence in the SPD that provides: "If you think your child will meet the above criteria at age 23, you must request *continuation of IBM health benefits* at least 60 days before his or her 23 [sic] birthday." (§ 3.1.1.4, IBM000039) (italicized emphasis supplied) Prior to attaining age 23, Joseph *was not receiving* IBM health benefits, was in no position *to apply for the "continuation* of IBM health benefits," and was not subject to a deadline applicable only to someone *who was* seeking the

IBM Plan Administrator
Employee Benefits
June 12, 2007
Page 4

"*continuation* of IBM health benefits." This sentence in the SPD simply does not apply to someone in Joseph's position.

Although IBM's April 26, 2007 Decision letter claims that this sentence in § 3.1.1.4 of the SPD requires the submission of an application "regardless of whether the child is enrolled in IBM benefit coverage at the time the child reaches age 23," this bald assertion is neither supported by the actual Plan language nor common sense. To the contrary, how could this sentence *possibly* apply to someone (like Joseph) who was not enrolled in the IBM Plan? Someone who is *not enrolled* in the IBM Plan is not, by definition, *receiving* IBM health benefits, and thus is not, by definition, able to apply for the "*continuation* of IBM health benefits." IBM's conclusion that Joseph is forever barred from receiving benefits ignores *what the contract actually states.*



What the SPD *actually* states ...

"If you think your child will meet the above criteria at age 23, you **must** request **continuation of IBM health benefits** at least 60 days before his or her 23ʳᵈ birthday."*

* Source—8/5/2003 SPD, IBM000039



What the SPD does *not* state ...

"If you think your child will meet the above criteria at age 23, you **must** **apply for your child's enrollment** in the program at least 60 days before his or her 23ʳᵈ birthday."#

# Source—Does not exist

What the SPD does *not* state ...

"If you think your child will meet the above criteria at age 23, you must seek **continuation of your child's eligibility under the IBM Plan** at least 60 days before his or her 23ʳᵈ birthday."#

# Source -Does not exist

IBM Plan Administrator
Employee Benefits
June 12, 2007
Page 5

The balance of the pivotal portion of § 3.1.1.4 of the SPD—also ignored in IBM's April 26, 2007 Decision letter—dispels any notion that Eileen and Joseph had only a one-time opportunity to enroll for important benefits that should protect Joseph for a lifetime. The operative paragraph of § 3.1.1.4 makes clear that an *eligible* dependent maintains his eligibility even *after* attaining age 23: "A child who *was eligible* under the plans *immediately before* reaching age 23 . . . and who, but for having reached age 23 would still be eligible, *will be eligible to enroll upon attainment of age 23* . . . and thereafter to remain *continuously* eligible *beyond the age of 23* if, *at the time the child enrolls*," he meets the eligibility requirements. (IBM000038) (emphasis supplied).

Because Joseph turned 23 on August 8, 2004, IBM has argued that Joseph was no longer eligible to enroll in the IBM Plan after June 9, 2004 —60 days prior to Joseph's birthday. The SPD makes clear, however, that Joseph was eligible to enroll "*upon attainment* of age 23," and remained "continuously *eligible beyond the age of 23*" if "*at the time the child enrolls*" he still meets the eligibility requirements. (IBM000038) Unlike the *inapplicable* provision erroneously cited by IBM—which pertains to *current* Plan participants seeking the "*continuation* of IBM health benefits"— the controlling provision of the SPD pertains to dependents— such as Joseph—who are merely *eligible* for benefits upon attaining age 23. The SPD provision for the *continuation of benefits* imposes a 60-day deadline, presumably to avoid the possibility of an unanticipated *discontinuation* of much-needed health benefits. When addressing eligibility— as opposed to the *continuation of benefits already being received* by an active plan participant— the SPD makes clear that *eligibility* begins "upon attainment" of age 23, and "*continuously . . . beyond the age* of 23" so long as "at the time the child enrolls" he meets the eligibility requirements. (emphasis supplied). Contrary to the "one shot" opportunity argument advanced by IBM, the SPD makes clear that Joseph's *eligibility* continues "*beyond the age of 23*."

The final bullet point of § 2.3 of the August 5, 2003 SPD dispels any doubt whether the SPD affords Joseph an annual opportunity to enroll in the IBM Plan so long as he continues to meet the eligibility requirements. Contrary to IBM's contention of a "one shot" opportunity to enroll Joseph in the IBM Plan, the SPD expressly provides: "Please note, *you may opt out* or waive coverage for your dependent child *one year and re-enroll* your child during *the next or subsequent annual enrollment period* as long as they continue to meet the eligibility criteria." (IBM000007) In the August 5, 2003 and September 9, 2004 Summary Plan Descriptions, this language appeared only in the introductory portion of the SPD in § 2.3. Beginning with the December 20,

IBM Plan Administrator
Employee Benefits
June 12, 2007
Page 6

2005 edition of the SPD, however, and continuing with the January 1, 2006 edition,[3]
IBM deliberately moved this language into § 3.1.1.4—the very section of the SPD that
contains the provision mistakenly relied upon by IBM—and the very section of the
SPD addressing Joseph's right to enroll in the benefits program for mentally disabled
dependents age 23 and older. (IBM000328) Having deliberately moved this definitive
language into the very section addressing the enrollment rights at issue in this appeal,
IBM cannot now argue that Joseph had only a one shot opportunity to enroll for these
benefits.

    Recapitulating the points mandating Joseph's enrollment in the IBM Plan:

- The introductory section of the IBM Plan repeatedly promised
  Eileen and Joseph the *annual opportunity* to enroll in the IBM
  Plan—twice in § 2.1 (IBM000018), and once again in § 2.3.
  (IBM000019)

- The specific section of the IBM Plan addressing benefits for
  mentally disabled dependents age 23 and older *expressly states* that
  Joseph was eligible for these benefits "upon attainment of age 23,"
  and that he would "remain continuously eligible *beyond the age
  of 23*," so long as "at the time [Joseph] enrolls," he meets the
  eligibility requirements. (IBM000038)

- Section 2.3 of the IBM Plan (and now § 3.1.1.4 of the IBM Plan)
  *expressly rejects* the notion of a "one shot" opportunity to enroll,
  stating in no uncertain terms that Eileen "may opt out or waive

---

[3] The most recent version of the SPD was *published* on December 22, 2006, with an *effective date* of
January 1, 2006. (IBM000913.) Similarly, the SPD for the "2005 Plan Year" purportedly was
published on December 20, 2005. (IBM000297.) It is unclear how IBM could rely upon an edition of
the SPD purportedly applicable to benefits due and owing throughout calendar years 2005 and 2006,
when the SPDs were not published until December 20th in 2005 and 2006. An SPD purportedly
effective on January 1st of the year, but is not published until December 20th of the year, does not serve
any meaningful purpose. What good is an SPD that is not published until there are only fifteen days
left in the calendar year to which it supposedly applies? If, on the other hand, IBM published multiple
editions of the SPD throughout calendar years 2005 and 2006, and the December 20th editions are just
the last in a series of periodically published updates, then Eileen has not been provided with the
documents she has requested. Any missing SPDs should be produced to Eileen immediately.

IBM Plan Administrator
Employee Benefits
June 12, 2007
Page 7

> coverage for [Joseph] one year and re-enroll [Joseph] during the
> next or subsequent annual enrollment period as long as [Joseph]
> continue[s] to meet the eligibility criteria." (IBM000007)

- IBM deliberately modified its SPD to move the language
  promising an annual right to opt into and out of coverage into the
  very section addressing Joseph's enrollment options for the
  benefits program for mentally disabled dependents age 23 and
  older. There is no question this annual enrollment option applies
  to the age 23 and older benefits program for mentally disabled
  dependents.

In the face of these clear and affirmative grants of annual enrollment options,
IBM's sole basis for blocking Joseph's enrollment in the IBM Plan is a clause applicable
only to *current* plan participants who want to avoid the possibility of their IBM health
benefits being unexpectedly *discontinued* for failure to satisfy the eligibility requirements
applicable to dependents age 23 and older. The provision erroneously relied upon by
IBM requires the submission of an application only for the "*continuation* of IBM health
benefits." *See* § 3.1.1.4. (IBM000039) The clause does not set a deadline for enrollment.
The clause does not set a deadline for continuation of eligibility. The clause sets a
deadline for *continuation* of the payment of *benefits.* Having promised in numerous places
throughout the SPD that Joseph could opt into and out of the program on an annual
basis, having specifically promised that Joseph is "continuously eligible beyond the age
of 23" so long as he is eligible "at the time [he] enrolls," it is astounding that IBM would
rely upon this inapposite, inapplicable language to deny Joseph access to these much
needed benefits. So long as the plain meaning of words in the English language prevails
when interpreting contract rights, a contractual requirement for the "continuation of
IBM health benefits" applies to one thing and one thing only—the *continuation* of IBM
*health benefits.*[4]

---

[4] IBM knows the difference between continuation of *eligibility* on the one hand, and the continuation of
benefits, or coverage, on the other hand—as made clear by a glance at the contrasting usages in the
2003 SPD. *See* § 2.1—"All *eligible* IBM employees ... must be *enrolled* in order to *receive* IBM
medical, dental and vision benefits." (IBM000011) (emphasis supplied); and § 2.3.1—"If you ... are
*eligible* ... to elect ... coverage through IBM ... you can *enroll* for coverage in one of two
ways. . . ." (IBM000020) *See also* § 2.3.2—"If you are leaving the company and meet certain age and
service requirements, you may be *eligible* to continue certain benefits coverage . . . ." (IBM000021);
§ 3.1.1.2—"continue to be eligible for SRMO" (IBM000036); § 3.1.1.2 "Eligible employees must
formally elect SRMO coverage within 60 days after retirement . . . and must make timely payment of

IBM Plan Administrator
Employee Benefits
June 12, 2007
Page 8

### IBM's Own Employee Interpreted the Plan as
### Confirming Joseph's Continued Eligibility to Enroll

Given the overwhelmingly clear language affording Eileen an annual right to enroll Joseph in the benefits program for mentally disabled dependents age 23 and older, there should be no need to go beyond the four corners of the SPD to resolve this appeal. Nonetheless, confronted with IBM's April 26, 2007 determination, the initial, favorable enrollment decision announced to Eileen in August 2006 plays an important role. IBM told Eileen in the SPD that "most questions can be answered by the IBM Employee Services Center ...." *See* § 5.1, ERISA INFORMATION. (IBM000147)  Naturally, Eileen directed her enrollment questions to the IBM Employee Services Center.  When Eileen called the IBM Employee Services Center in August of 2006, she was told by the responsible employee that Joseph would be added to the IBM Plan.  The IBM Plan employee making this statement no doubt was guided by the plain language of the SPD set forth in this letter, as well as IBM's more recent modifications to the SPD making it even clearer that Joseph was eligible to be enrolled. If the position now advanced by IBM were even a *remotely* reasonable interpretation of the controlling language of the IBM Plan, IBM's own, initial interpretation of an at best ambiguous clause must be adopted for the benefit of Joseph.  IBM wrote the plan, IBM's trained employee interpreted the plan, and now IBM must give Joseph the benefit of that interpretation.

In *Central States v. Kroger Co.*, 226 F.3d 903, 911 (7th Cir. 2000), the Seventh Circuit held that "[f]ederal common law rules of contract interpretation apply when we consider a contract in the context of an ERISA claim."  When confronted with an

---

the applicable contribution amounts on an ongoing basis *in order to remain eligible*." (IBM000036); § 3.1.1.5—"eligibility for coverage will continue instead under the prior IBM retiree medical program." (IBM000039); § 3.1.5—"In such cases, eligibility continues . . . ." (IBM0000 39); § 3.1.5—"eligible children may be eligible for continued access to IBM coverage" (IBM000040); § 3.1.4.1—"To continue coverage under the Plan, you have the option to purchase continuation coverage for a limited time. . . ." (IBM000046); §§ 3.3.7.19, 3.3.7.22—"to determine continued eligibility for benefits" (IBM000068); § 3.3.9.3—"will continue to be eligible for benefits" (IBM000074).  Indeed, in multiple clauses of the SPD, IBM specifically contrasts the competing notions of eligibility for benefits and actual receipt of benefits.  *See* § 3.1.3 ("IBM Medical and Dental Benefits Plan will *enroll* participants and *eligible* family members, and determine and pay *benefits*, without taking into account their *receipt* of, or *eligibility for*, medical assistance under a federally approved state Medicaid program." (IBM000045); and § 3.1.4.1 ("Information concerning *enrollment*, *coverage* and *eligibility* may be obtained by contacting the Employee Services Center . . . .") (IBM000047).

IBM Plan Administrator
Employee Benefits
June 12, 2007
Page 9

ambiguous plan provision, the "task of the court is to determine what 'the contracting parties … intended the clause to mean.'" *Id.* In such cases, "the court may look at extrinsic evidence to determine the meaning the contracting parties attached to the ambiguous term." *Id.* Among other items of extrinsic evidence, the court may look at the parties' own, practical interpretation of the disputed provision prior to the dispute. *Id.* at 913, and 914 n.3. In this case, that brings us to the interpretation of the IBM Plan announced to Eileen during her August 2006 contact with the IBM Employee Services Center employee charged with the responsibility of answering employees questions about how the IBM Plan is interpreted and applied.

Not only did the IBM Plan employee interpret the SPD as affording Joseph a right to enroll for benefits, but it is probable (if we assume a competent, well trained employee would dispense identical advice when confronted with identical questions) that the same interpretation was given by this employee to other Plan participants over the years. Unless that employee was trained differently than all the other IBM Plan employees, moreover, it is probable that other IBM Plan employees gave precisely the same answer to other employees over the years.

For the same reason, the notes, emails, drafts, and other evidence of the drafting process leading to the modified, December 2005 SPD are all highly probative evidence of IBM's own construction of the IBM Plan as affording an annually renewing right to opt in to and out of the program as often as participants chose to do so. IBM cannot maintain that the SPD language promising annual opt-in and opt-out rights does not apply to the age 23 and over benefits program for mentally disabled dependents when it specifically moved this language into the very section of the SPD addressing that benefits program.

In short, the interpretation provided by IBM's Plan representative in August of 2006 must carry the day, as such interpretations are "particularly compelling" evidence and must have a "great, if not controlling, influence" in resolving ambiguous clauses in favor of plan fiduciaries (such as Eileen and Joseph) seeking payment of the benefits to which they are entitled under the IBM Plan. *Kroger,* 226 F.3d at 914 n.3. This compelling evidence is even more persuasive, of course, when it is considered that it is IBM who wrote the plan—not Eileen or the other plan fiduciaries. Ambiguous policy

IBM Plan Administrator
Employee Benefits
June 12, 2007
Page 10

provisions must be resolved against the drafter and in favor of the insured, *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 311 (7th Cir. 1992), providing yet another reason why IBM must enroll Joseph in the Plan.[5]

## Conclusion

Eileen devoted over 30 years of her professional life to IBM. Eileen served IBM extremely well over those years, and now richly deserves each and every benefit and other entitlement promised to her as an employee—and as a retiree—of IBM. Eileen is not asking for favors or special treatment—she is asking only that IBM live up to the plain language of the Plan.

While each and every employee and retiree of IBM, as a fiduciary, is entitled to his or her contractual benefits, IBM's wrongful expulsion of a mentally disabled young man from the IBM Plan is troubling in the extreme. Parents such as Eileen who are called upon to overcome the constant, pressing challenges of raising, caring for, and protecting a mentally disabled child are asked to assume burdens that might justifiably cause Atlas to shrug. Nothing comes easy to these parents and their families—whether it is fighting school districts for their child's right to be educated, struggling to find the best, most nurturing environments during the different phases of their child's development, agonizing about whether they have done everything feasible to help their child achieve some measure of fulfillment despite their disability, or shouldering the endless financial burdens required to meet the unique needs of these children. Nor has life been easy for Joseph, a young man who was never blessed with the simple ability to express his thoughts, his concerns, and his emotions through the spoken word. Eileen and Joseph are not asking for sympathy or favors because of these challenges—they

---

[5] Unless IBM reverses its mistaken determination in the April 26, 2007 Decision and enrolls Joseph in the IBM Plan, Eileen requests that IBM provide her with the additional information set forth in Tab 4. *See* Tab 4, Request for Documents and Information.) As IBM acknowledges in § 5.1 of the SPD, IBM owes a fiduciary duty to Eileen and Joseph. If IBM presses its new interpretation of the Plan, the information requested in this appeal letter is critically important to a full and fair resolution of Eileen and Joseph's rights. It is my assumption that IBM will have an equal interest in assembling and reviewing this information to be sure that it reaches the correct result, and will agree with the importance of sharing this information with Eileen and Joseph. Since seventh circuit case law makes clear that such information is highly relevant to reaching the correct result, IBM should make every reasonable effort to ensure that such information is identified, assembled, and carefully considered before precipitously rejecting Joseph's eligibility for enrollment in the IBM Plan.

IBM Plan Administrator
Employee Benefits
June 12, 2007
Page 11

are simply asking IBM not to add to these burdens by wrongfully excluding a mentally disabled young man from the Plan based upon an "interpretation" that finds no basis in the four corners of the SPD.

IBM's "interpretation" of the SPD is not only unsupported by the SPD language, but also is the paradigm "trap for the unwary," resulting in the permanent loss of valuable, lifetime benefits without warning to the affected plan participants. It is difficult to imagine that IBM intends to impose such draconian results upon its fiduciaries with no effective notice of this potential. If IBM really intends to impose such a barrier to the receipt of these important benefits, then it should do so *prospectively* by re-writing the Plan in plain, conspicuous language that Eileen, its own employees, and other plan participants could easily read and understand. Sections 2.1 and 2.3 do not say that participants have an annual enrollment right *subject to important exceptions and caveats buried deep in the SPD*. Section 3.1.1.4 itself does not warn—anywhere —that *eligibility* for benefits at age 23 and beyond is subject to a one-time opportunity within a narrow, 60-day window, to secure those rights for the rest of the dependent's life. Nothing in the SPD warns Eileen or other unsuspecting fiduciaries that important rights could be forever waived based upon a single sentence in the SPD that does not even mention continuation of eligibility. Instead, a plan participant whose dependent *is not currently receiving* IBM health benefits will conclude—as did Eileen *and* IBM's own employee here—that a procedure for applying for the *continuation* of IBM health benefits does not apply to her.

As the Seventh Circuit stated in *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 587 (7th Cir. 2000), a summary plan description must be written "in a manner calculated to be understood by the average plan participant, and [be] sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." This standard is not met, of course, if the plan language "leave[s] the employee . . . guessing as to the appropriate course of action." *Id.* at 588. IBM's *own employee* concluded that Joseph could be enrolled in this Plan in August of 2006. If IBM's own employee did not reach the conclusion now advanced by IBM—a professional trained to interpret the Plan and answer questions posed by Plan participants— the Plan obviously falls far short of language "calculated to be understood by the average plan participant."

IBM Plan Administrator
Employee Benefits
June 12, 2007
Page 12

It is difficult to imagine how IBM, after reviewing the provisions of the Plan cited and discussed in this letter, could conclude that it has drafted a plan that "reasonably apprises" participants such as Eileen that they have a single, 60-day window to secure lifetime benefits for their mentally disabled children. Accordingly, Eileen renews her request that Joseph be enrolled in this program without further delay.

I have enclosed the documents requested in the April 26, 2007 Decision. *See* Tabs 1, 2, and 3. If you have any questions or require any additional information, please do not hesitate to call.

Very truly yours,

Paul F. Heaton

PFH/js

Encs.

cc      Ms. Eileen Huss

# EXHIBIT 2

## TAB 4—REQUEST FOR DOCUMENTS AND INFORMATION

1.      August 2006 Employee Services Center Contact

   a.      Name and title of employee who affirmed eligibility

   b.      Date and time of the communication

   c.      All documents reflecting this contact, and any follow-up steps or
           communications between July 31, 2006 and the present relating to
           Joseph's attempted enrollment in the IBM Plan

   d.      All electronic records, communications, emails, and other electronic
           documents reflecting the August 2006 conversation, and relating to all
           follow-up steps or communications between July 31, 2006 and the
           present relating to Joseph's attempted enrollment in the IBM Plan

2.      Drafting History for 2005 SPD Revisions

   a.      All documents reflecting the decision to modify the SPD to move the
           annual enrollment option language from § 2.3 to § 3.1.1.4

   b.      All documents reflecting communications, memos, drafts, and emails
           concerning this modification of the SPD

3.      Other Plan Documents/Insurance Policies

   a.      IBM has only produced a "Summary Plan Description." By definition, a
           Summary Plan Description is just that—a "summary" of the actual plan.
           Eileen renews her request for any and all documents that reflect the
           terms and conditions of the actual plan—as opposed to different
           iterations of the SPD—whether taking the form of a formal Plan
           Document, insurance policies, or other documents of any kind.

   b.      If the Summary Plan Descriptions that have been produced are the only
           "plan documents," please explain in plain terms why such is the case—
           why there are no underlying plan documents.

   c.      If there are no longer any operative plan documents other than the
           Summary Plan Descriptions, but there were formal plan documents at
           some point in time, please advise of date of the last, underlying, formal

plan document for IBM health benefits, and produce a copy of that actual plan document. Further, produce documentation invalidating such plan document, and adopting the practice of relying solely on "summary plan descriptions."

d. The 2006 SPD produced by IBM was published on December 31, 2006, but was "effective" January 1, 2006. Please explain how an SPD governing calendar year 2006 could be the operative, controlling plan document for that calendar year if it was not made available by publication until the last day of the calendar year. If, on the other hand, there was an edition of the SPD published prior to the 2005 and 2006 editions previously produced by IBM, produce all such editions for 2006, as well as any other interim editions that have not been produced during the time period in question—January 1, 2003 to the present.

e. Produce any and all documents, internal memos, interpretation notes, or other written materials that reflect or discuss in any fashion the eligibility and enrollment requirements for the IBM Plan in general, and for the age 23 and older mentally disabled dependent benefits in particular. Do the insurance contracts include sections on eligibility? Do the third-party administrators have governing documents addressing eligibility? If so, please identify and produce such documents.

4. Other Affirmations of Continued Eligibility

a. Produce documents reflecting other instances similar to the August 2006 conversation in which IBM Plan employees/representatives confirmed that eligibility continues beyond age 23, and is not subject to a 60-day window application.

b. Produce any internal business communications addressing this topic.

5. Documents reflecting the complete record of any contacts and communications between Eileen and IBM concerning eligibility, enrollment, and receipt of benefits under the IBM Plan

6. History of Joseph's enrollment in the IBM Plan from the beginning of Eileen's employment to the present